[776 NYS2d 56]

CAROLYN BROWN, Appellant, v C. FRANCOIS JEAN ACHY et al.,
Respondents.

First Department, May 6, 2004

APPEARANCES OF COUNSEL

*Sanders, Sanders, Block & Woycik, P.C.*, Mineola (*Michael F. Villeck* of counsel), for appellant.

*Anthony J. Benedict*, Pearl River, for C. Francois Jean Achy and another, respondents.

*Gilroy Downes Horowitz & Goldstein*, New York City (*Michael M. Horowitz* of counsel), for Leonor Reynoso, respondent.

## OPINION OF THE COURT

MARLOW, J.

This personal injury lawsuit emerges from an automobile accident, and once again presents us with the sometimes frustrating task of deciding when evidence presented on a motion for summary judgment meets the "serious injury" threshold (Insurance Law § 5102 [d]), an elusive standard that all too frequently escapes facile and final resolution. In determining a motion for summary judgment where the issue is whether plaintiff has sustained a serious injury defined by Insurance Law § 5102 (d), the defendant bears the initial burden to present competent evidence that the plaintiff has no cause of action (*see Rodriguez v Goldstein*, 182 AD2d 396 [1992]). Defendants *here* met their burden by presenting reports of two doctors who conducted independent medical examinations. These reports—despite acknowledging the report of plaintiff's MRI which defendants initially submitted in support of their respective motions which revealed a central cervical disc herniation at C3-4—concluded that there were no other objective findings to confirm the disc herniation.

However, plaintiff's submissions in response to the respective motions, when viewed in their entirety, constitute objective evidence sufficient to raise a triable issue of fact as to serious injury. Plaintiff, in addition to the MRI report, relies on the results of an EMG/NCV (electromyogram and nerve conduction velocity) study, initially submitted in support of defendants' motions, with abnormal findings at C5-6 and L5-S1. The results of the NCV test, conducted within six months of the accident, were included in a report prepared by plaintiff's neurologist dated June 11, 1998, together with his observations that plaintiff suffered from decreased range of motion in her head, neck and lower back. In addition, plaintiff's doctor submitted

an affirmation, prepared after a recent examination, that plaintiff has a 25% loss of lateral flexation and rotation in the cervical spine bilaterally; that plaintiff has a 25% loss of forward flexion in the lumbar spine; and that plaintiff's seated straight-leg raising test is positive bilaterally at 60 degrees. Plaintiff's doctor also concluded that plaintiff has a "permanent partial disability."[1]

Evidence of range of motion limitations is sufficient to defeat summary judgment (*see Toure v Avis Rent A Car Sys.*, 98 NY2d 345, 350 [2002]; *Eng v New Main Line Trading Corp.*, 249 AD2d 359 [1998]; *Cassagnol v Williamsburg Plaza Taxi*, 234 AD2d 208 [1996]). Furthermore, this Court has held that straight-leg raising tests are objective evidence of serious injury (*see Aguilar v N.Y.C. Water Works*, 298 AD2d 245 [2002]; *Adetunji v U-Haul Co. of Wis.*, 250 AD2d 483 [1998]), especially where, as here, they are coupled with positive MRI and nerve conduction velocity test results. That the MRI report and nerve conduction velocity study results are unsworn "does not avail" defendants (*Gonzalez v Vasquez*, 301 AD2d 438, 439 [2003], relying on *Ayzen v Melendez*, 299 AD2d 381 [2002] [results of MRI were referred to by defendant movant's examining neurologist and therefore were properly before the court]).

Since plaintiff has submitted competent objective evidence to confirm the findings of both the MRI and EMG/NCV studies, she has raised a triable issue of fact whether she sustained a serious injury as defined by the Insurance Law (*see Aguilar, supra* [nerve conduction velocity tests and MRI in conjunction with positive straight-leg raising test objective evidence of serious injury]; *see also Puma v Player*, 233 AD2d 308 [1996] [positive MRI and doctor's conclusion that bulge was traumatically induced and cause of plaintiff's pain and restriction of range of motion sufficient to raise triable issue of fact]; *Spezia v De Marco*, 173 AD2d 462 [1991] [results of NCV tests purported to confirm diagnosis of cervical radiculopathy]). These objective medical findings coupled with plaintiff's chiropractor's affidavit, which contains a finding of permanency and causally relates her injuries to the underlying accident (*see Caraballo v Pearson*, 261

---

1. While the dissent mentions plaintiff's overweight condition in his description of her, we can only conclude that he does so to imply that her injuries are causally related to her weight and therefore a factor which should deny her the opportunity to make her case on the merits before a jury. While he may be correct, plaintiff's weight is no more than one factor and raises nothing more than an additional issue for the trier of fact.

AD2d 565 [1999]; *cf. Komar v Showers*, 227 AD2d 135 [1996] [insufficient evidence to connect plaintiff's injuries to accident]), are sufficient to defeat defendants' motions.

The dissent suggests that under *Nitti v Clerrico* (98 NY2d 345, 355 [2002]), one of the cases decided with *Toure*, the Court of Appeals would reject straight-leg raising tests as objective tests of serious injury, because these tests which chiropractors employ to determine a plaintiff's range of motion limitations are in part based on a plaintiff's subjective complaints of pain. The dissent further states, "the existing record does not establish whether the particular tests used by plaintiff's medical experts were based on subjective complaints of pain, and defendants should not be precluded from exploring this issue at trial."

We emphasize that our conclusion in this case is based not only on straight-leg raising tests, but on positive MRI and EMG/NCV test results as well. Therefore, in this case, we need not determine whether our dissenting colleague's interpretation of *Nitti v Clerrico* is correct, nor reach the issues of whether straight-leg raising tests alone would be sufficient under *Toure*, and whether our own past decisions (*see e.g. Aguilar, supra; Adetunji, supra*) are consistent with *Toure*'s reasoning.

As for the dissent's admonition that the defense be permitted at trial to explore the subjective components of any tests used by experts to form their opinions on the subject of serious injury, that is fair and reasonable and we agree.

The more than two-year gap in treatment between plaintiff's visits to the chiropractor—the first visit within 10 days of the accident and regular visits for at least five months thereafter—and the recent examination conducted by her physician, the results of which were submitted in opposition to defendants' respective motions, go to the weight, not the admissibility, of the evidence.[2] Where, as here, plaintiff's chiropractor averred that she "received an adequate course of conservative management

2. Our dissenting colleague in footnote 1 disagrees that plaintiff's November 9, 2000 and August 2, 2001 visits to Dr. Hausknecht were for treatment, rather than diagnosis. He seems to assert that these visits were purely made in defense of summary judgment motion practice rather than for medical reasons. However, defendants' instant motion for summary judgment postdates both visits, which, at worst, presents an issue of fact as to plaintiff's motive for seeing Dr. Hausknecht on those two occasions. Moreover, Dr. Hausknecht concludes under oath, after specifying with numerical detail during the latter exam that the tests he administered confirmed serious injury, that plaintiff "will continue care under my supervision." While Dr.

and had reached her maximal medical improvement when she stopped treating with me[,]'' plaintiff has, with minimal adequacy, explained her treatment gap in this case (*see Ramos v Dekhtyar*, 301 AD2d 428, 429-430 [2003]; *see also Lantigua v Williams*, 305 AD2d 286 [2003], citing *Ramos* with approval; *compare Melendez v Feinberg*, 306 AD2d 98, 99 [2003], *lv denied* 1 NY3d 508 [2004]). To find differently at this juncture would, according to precedent (*see* n 2, *supra*), invade the jury's province.

We respectfully disagree with our dissenting colleague's position that plaintiff's chiropractor's opinion that plaintiff was treated until she reached her "maximal medical improvement" is insufficient as a matter of law to explain the plaintiff's gap in treatment, because, purportedly, it materially differs from the medical explanation the Court of Appeals found sufficient in *Toure*, i.e., that plaintiff could derive no "benefit in her continuing to seek medical treatment for this condition" (98 NY2d at 355). We see each of these two statements, respectively given to explain the plaintiff's treatment gaps in each case, as similar for all practical purposes, if not exquisitely identical in meaning. To hold otherwise would, in our view, revere form over substance. The dissent's other attempts to distinguish the two medical statements, in our view, simply raise additional factual issues to be explored at trial.

Accordingly, we find that plaintiff has raised a triable issue of fact as to whether she sustained a serious injury under the Insurance Law, and, consequently, we need not address plaintiff's more specific claim that she sustained an injury which prevented her from performing substantially all of her daily activities for at least 90 out of the 180 days following the accident. Finally, we dismiss plaintiff's purported appeal from the decision, as no appeal lies therefrom (*see Matter of Civil Serv. Empls. Assn. v Pilgrim Psychiatric Ctr.*, 204 AD2d 444 [1994]; *Matter of Willoughby Realty & Mgt. Co. [New York State Ind. Union of Bldg. Serv. Empls. & Factory Workers, Local 2]*, 9 AD2d 889, 890 [1959] [dissenting mem]).

---

Hausknecht's affirmation could have been worded with greater particularity, we are unwilling to resolve factual issues and ambiguities in favor of either side at this juncture. Indeed, it is well-settled that our mission on summary judgment must be " 'issue-finding, rather than issue-determination' " (*Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 404 [1957], quoting *Esteve v Abad*, 271 App Div 725, 727 [1947]; *see also Epstein v Scally*, 99 AD2d 713, 714 [1984] [summary judgment is a drastic remedy and should not be granted where triable issues of fact are raised and cannot be resolved on conflicting affidavits]).

Accordingly, the order of the Supreme Court, Bronx County (Howard R. Silver, J.), entered May 6, 2002, which granted the separate motions of defendant Leonor Reynoso and defendants C. Francois Jean Achy and Bamba Idrissa for summary judgment dismissing the complaint for failure to establish a serious injury as defined by Insurance Law § 5102 (d), should be reversed, on the law, without costs, the respective motions denied and the complaint reinstated. The purported appeal from a decision, same court and Justice, entered on or about March 18, 2002, should be dismissed, without costs, as taken from a nonappealable paper.

FRIEDMAN, J. (dissenting). Plaintiff walked away from the scene of the subject automobile accident and thereafter traveled by subway and train from the Bronx to Long Island. Ultimately, she went for three years (from September 1998 to September 2001) without seeking medical care for her alleged serious injuries. Nonetheless, plaintiff alleges that she suffered a "serious injury" within the meaning of Insurance Law § 5102 (d). The majority, relying on "objective" evidence supplied only by unsworn and unaffirmed reports that defendants submitted for purposes of refutation, now holds that plaintiff is entitled to a trial on this issue. In my view, because plaintiff has not given us any substantive explanation for her protracted period without treatment, Supreme Court's order dismissing her action should be affirmed. Accordingly, I respectfully dissent.

On December 25, 1997, plaintiff, who then resided at a rehabilitation center on Long Island, visited her sister in the Bronx. After the visit, while defendant Achy was driving plaintiff to a subway station, a car operated by defendant Reynoso collided with the driver's side of the Achy vehicle. When the police arrived, plaintiff—who had been sitting in the front passenger's seat of Achy's car—declined their offer of ambulance transportation to a hospital, explaining that she wished to comply with her rehabilitation center's curfew policy. Accordingly, instead of going directly from the scene of the accident to a hospital, plaintiff walked to the subway station, and thereafter made the long trip from the Bronx to Long Island by public transportation.

After arriving at the rehabilitation center, plaintiff went to the emergency room of a hospital in Bay Shore, Long Island, where she was examined, x-rayed, given Motrin and discharged, all during the evening of the day of the accident. Plaintiff alleges that she was bedridden for two weeks after the accident.

She resumed full-time work the following month (January 1998).

It appears that the first professional plaintiff consulted about her alleged injuries (after her brief emergency room visit) was her lawyer. According to plaintiff's deposition testimony, it was her lawyer who referred her to Dr. Jacqueline Dimalante, a chiropractor, whom plaintiff first visited 10 days after the accident. Plaintiff visited Dr. Dimalante periodically from January to July of 1998, and then once more the following September, to receive treatment for neck and back pain. During the three years from her last visit to Dr. Dimalante in September 1998 until her papers opposing defendants' summary judgment motion were submitted in September 2001, plaintiff apparently did not receive any treatment for physical complaints allegedly connected to the subject accident.[1]

Dr. Dimalante referred plaintiff to Dr. Isaac Sultan, a neurologist, to whom plaintiff made only one visit, on June 11, 1998. In an unsworn, unaffirmed report, Dr. Sultan recommended various forms of follow-up care. Aside from seeing Dr. Dimalante several more times through September 1998, plaintiff did not avail herself of any of the follow-up care Dr. Sultan recommended. Dr. Dimalante also referred plaintiff to Dr. Howard M. Rombom, a psychologist, for treatment of an "adjustment disorder w[ith] mixed anxiety [and] depressed mood" that was alleg-

---

1. Contrary to the majority's assertion, the record contains no evidence that plaintiff received any medical treatment (as opposed to diagnostic examination) after September 1998. The majority, while conceding that there was a gap in treatment of more than two years, miscalculates the extent of that gap, a miscalculation that appears to arise from the majority's assumption that the period without treatment ended with the November 9, 2000 examination conducted by Dr. Hausknecht. While the November 9, 2000 examination provided part of the basis for Dr. Hausknecht's August 2001 affirmation opposing defendants' motion for summary judgment, the Hausknecht affirmation does not describe any treatment that Dr. Hausknecht rendered to plaintiff on November 9, 2000, on August 2, 2001 (when he again examined her), or on any other date. Rather, Dr. Hausknecht specifies, in conclusory fashion, only the diagnostic procedures he conducted. Surely, a medical examination conducted for the sole purpose of providing a basis for an expert affirmation to be used in litigation cannot be considered "treatment." The fact that plaintiff made her two visits to Dr. Hausknecht before defendants moved for summary judgment provides no indication that the visits had any purpose other than furthering this litigation. Both visits occurred while this action was pending, and, to reiterate, plaintiff has not identified any treatment Dr. Hausknecht provided during either visit. Surely, plaintiff's counsel anticipated that defendants would move for summary judgment. In fact, defendant Reynoso's motion for summary judgment came just days after plaintiff's second visit to Dr. Hausknecht.

edly an outgrowth of the car accident. Between April and June of 1998, plaintiff made 12 visits, of 15 to 20 minutes each, to Dr. Rombom.

An MRI of plaintiff's cervical spine was made in April 1998, apparently also upon Dr. Dimalante's reference. According to the unsworn and unaffirmed MRI report of Dr. Michael Carlin, dated April 17, 1998, the only abnormality the MRI revealed was "[c]entral disc herniation at C3-C4." "No other focal disc herniation is seen," Dr. Carlin reported. The report of another physician based on an examination of the same MRI, that of Dr. Frank M. Hudak, dated September 14, 1999, reached a different conclusion. Dr. Hudak—who affirmed his report—made the following findings:

> "Review of actual MRI of the claimant's cervical spine failed to reveal an acute herniated disc at any level and no herniated disc at the particular C3-4 level as mentioned in the radiology report [of Dr. Carlin]."

In moving for summary judgment in this action, defendants submitted Dr. Hudak's MRI report, as well as his affirmed report based on an examination of plaintiff conducted in May 1999. Dr. Hudak's examination report noted that plaintiff's stated height was 5 feet, 3 inches, and her weight was then 290 pounds. From the examination, Dr. Hudak concluded:

> "[Plaintiff] is not disabled as a result of that accident [of December 25, 1997] and requires no further orthopedic care or physical therapy. There are no objective findings at this time to confirm the presence of an acute herniated disc in the area of the cervical spine related to the accident of 12/25/97."

Among other things, Dr. Hudak took range of motion measurements for both the cervical and lumbar spine. Dr. Hudak noted that "[e]xamination of both upper extremities reveals full range of motion of shoulders, elbows, wrist, and hands with no pain noted." He further noted that, with regard to her lower extremities, plaintiff had "bilaterally negative straight-leg raising tests." While acknowledging that Dr. Sultan's unaffirmed 1998 report referred to "electrophysical evidence of acute left sided L5-S1 radiculopathy," Dr. Hudak noted that plaintiff "had no complaints of such a condition" at the time he examined her.

Defendants also submitted the affirmed report of Dr. Jay A. Rosenblum, dated March 1, 2001, which was based on a

neurological examination of plaintiff Dr. Rosenblum conducted on that date. After conducting a variety of tests, Dr. Rosenblum concluded that there "is no neurological sequela from the trauma of 12-25-97." Among other things, Dr. Rosenblum noted that "[a] seated straight leg test [of plaintiff] was negative."

This Court has held that, under *Toure v Avis Rent A Car Sys.* (98 NY2d 345 [2002]), summary judgment should be granted on the issue of "serious injury" within the meaning of Insurance Law § 5102 (d) where the plaintiff fails to proffer a sufficient explanation for the passage of a lengthy period of time during which he or she was not treated for the alleged injuries attributed to the car accident (*see Pommells v Perez*, 4 AD3d 101, 101 [2004] [unexplained gap in treatment of nearly four years rendered speculative any conclusion as to causation of plaintiff's alleged injuries]; *Shinn v Catanzaro*, 1 AD3d 195, 198-199 [2003] [no triable issue as to serious injury existed where, inter alia, 4½-year lapse in treatment was unexplained]; *Melendez v Feinberg*, 306 AD2d 98, 99 [2003], *lv denied* 1 NY3d 508 [2004] [no triable issue where lack of treatment from January 1998 to May 2001 was unexplained]; *Vaughan v Baez*, 305 AD2d 101, 101-102 [2003] [no triable issue where lack of treatment from late 1999 to May 2001 was unexplained]; *cf. Toure*, 98 NY2d at 355 [extended period during which plaintiff did not receive treatment was sufficiently explained by physician's testimony that plaintiff would derive no benefit from continued medical treatment]). Significantly, the three-year period without treatment in this case is approximately twice as long as the period without treatment in *Vaughan v Baez* (not cited by the majority). To the extent (if any) plaintiff's medical evidence might otherwise be deemed to have raised a triable issue as to the existence of a statutory "serious injury," I believe that such evidence is negated, as a matter of law, by plaintiff's unexplained failure to obtain any treatment for her alleged injuries for a period of about three years prior to the submission of her opposition to the summary judgment motion.

I cannot agree with the majority's view that plaintiff has proffered a sufficient explanation for the lengthy period during which she received no treatment. Dr. Hausknecht and Dr. Dimalante opined only that plaintiff had reached the point of "maximal medical improvement." This altogether vague and conclusory assertion, without any substantive elaboration, simply does not explain the gap in treatment. Moreover, neither physician stated that plaintiff could not derive any benefit from

further treatment, which was the explanation found sufficient in *Toure*.[2] I disagree with the majority's view that the "maximal medical improvement" statements made here are "similar for all practical purposes" to the certification in *Toure* that further treatment would afford no benefit. The majority ignores the possibility that further medical treatment might well be useful for purposes of pain management, assuming that plaintiff's injuries are as severe as she claims. Nothing stated by Dr. Hausknecht or by Dr. Dimalante negates this possibility.

Even more significantly, the majority disregards the statements of plaintiff's own experts that actually support the view that plaintiff would benefit from continuing treatment. Dr. Hausknecht, for one, concluded his affirmation with the statement that plaintiff "will continue care under my supervision" (although he failed to describe any prior care that had been provided under his supervision). In addition, an earlier report by another of plaintiff's physicians (Dr. Isaac Sultan), based on his neurological examination of plaintiff on June 11, 1998, recommended "[c]ontinu[ing] the present pain management and follow-up care," and a "[f]ollow-up evaluation [with Dr. Sultan] in 3-4 weeks or sooner." Again, it is uncontroverted that plaintiff never followed up as recommended by Dr. Sultan, and the majority can point to no explanation for her failure to do so.

I would further note that, even under the majority's holding that summary judgment should be denied, defendants should have an opportunity at trial to establish that any test results submitted by plaintiff do not constitute objective evidence of serious injury because they are based on plaintiff's subjective reactions. In *Nitti v Clerrico* (one of the cases addressed by the Court of Appeals in the *Toure* decision), the Court of Appeals held that a chiropractor's opinions concerning the plaintiff's limitation of motion did not constitute objective medical proof of serious injury because the chiropractor "testified on cross-examination that the tests he administered to reach his conclusion regarding plaintiff's limitation of motion were subjective in nature as they relied on plaintiff's complaints of pain" (98 NY2d at 357-358). It is significant, given the instant plaintiff's reliance on straight-leg raising tests (which, when administered by defendants' experts, yielded negative results), that the chiroprac-

---

2. It is noteworthy that this portion of *Toure* relates to the *Manzano* case, which was an appeal after a trial at which the plaintiffs offered the only expert testimony.

tor's limitation of motion opinion in *Nitti* was also based on, among other procedures, a straight-leg raising test (*see Nitti v Clerrico*, 291 AD2d 807, 807 [2002], *revd* 98 NY2d 345 [2002]). Here, the existing record does not establish whether the particular tests used by plaintiff's medical experts were based on subjective complaints of pain, and defendants should not be precluded from exploring this issue at trial.

Finally, I observe that there is a troubling aspect to plaintiff's opposition to the motions for summary judgment, in that it depends, in the final analysis, on unsworn and unaffirmed reports. Specifically, Dr. Carlin's unsworn and unaffirmed MRI report, and Dr. Sultan's unsworn and unaffirmed report referring to certain electrodiagnostic tests, comprise the sole "objective medical evidence" (*Toure*, 98 NY2d at 353) plaintiff offers to support the affirmed diagnoses of Drs. Hausknecht and Dimalante. Although the majority finds that defendants, by submitting the Carlin and Sultan reports with their own moving papers, have waived any objection to the admissibility of such reports, I note that defendants plainly submitted those reports—whose conclusions are contradicted by the affirmed reports of defendants' experts—for the purpose of *refuting* them, not in order to place reliance on them. Even if defendants have waived the objection to the admissibility of these reports, it is noteworthy that plaintiff has essentially failed to submit any legally admissible objective medical evidence in support of her claim. In light of this deficiency in plaintiff's evidence, the majority's overlooking of the lengthy gap in the treatment of plaintiff's allegedly "serious injury" is even more difficult to understand.

MAZZARELLI, J.P., and GONZALEZ, J., concur with MARLOW, J.; ANDRIAS and FRIEDMAN, JJ., dissent in a separate opinion by FRIEDMAN, J.

Order, Supreme Court, Bronx County, entered May 6, 2002, reversed, on the law, without costs, defendants' motions for summary judgment denied and the complaint reinstated. Appeal from decision, same court, entered on or about March 18, 2002, dismissed, without costs, as taken from a nonappealable paper.