*187 OPINION OF THE COURT
Paul A. Victor, J.
Relief Sought
Defendants Ricardo Maldonado and Zobeida Franco move for summary judgment pursuant to CPLR 3212 and dismissal of the complaint against them, for the failure of the plaintiff Victor Vidal to prove that he has sustained a “serious injury,” as that term is defined in section 5102 of the Insurance Law.
Another Frustrating Assembly Line “Serious Injury” Motion
The defendants’ motions and plaintiffs’ responses have become almost assembly line, “cookie cutter” prototypes; and attorneys for defendants (and most plaintiffs) have become expert on how to present or attack a serious injury claim.
Defendants are very adept at providing prima facie proof demonstrating that a plaintiff has not suffered a serious injury; proof at the very least sufficient to meet their “initial burden” to present competent evidence that plaintiff has no cause of action. Plaintiffs, too, have become quite conversant with the requirements to defeat a defendant’s motion.
Defendant’s counsel usually submits at least two (sometimes three) affirmations of so-called “independent”[1] medical experts (an orthopedist, a neurologist, and radiologist, usually from the same stable of defense medical experts), each of whom examine the plaintiff and/or the reports and tests submitted by plaintiff, and then by affirmation refute plaintiffs claim to have sustained a serious injury. These examinations usually take place years after the automobile accident which has been alleged to cause injury, and each of the defendant’s medical experts conclude that plaintiff is no longer impaired or injured; that all tests and *188 findings are normal; that if originally injured, said injuries have resolved; and that, in any event, all of plaintiffs claimed limitations or impairments have been caused, not by the accident, but by degenerative (normal aging process) changes in the cervical and lumbar regions. Except for the dates and the unique peripheral circumstances presented by each case, these medical reports and affirmations submitted by defendant’s chosen medical experts, are virtually identical. Plaintiffs submissions, made in opposition to a defendant’s motion, are no less boilerplate.
Following an automobile accident many of the claims made by plaintiffs seem to have the same script; and many of the medical experts also are drawn from an oft-used and known pool of plaintiffs’ physicians. In addition to “treating” physicians (usually a chiropractor and/or physiatrist, and sometimes the family doctor), plaintiffs proof of serious injury is “supported” (as it must be in accordance with judicially imposed guidelines) by an attempt to provide the “qualitative” or “quantitative” assessment of an orthopedist or a neurologist, who, after conducting a number of range of motion (ROM) tests (which are said to be positive because of the detection of spasm), and reviewing a positive MRI and/or an EMG/NCV test, concludes that plaintiff has a herniated disc or bulges which impinge on the thecal sac and thus causing significant limitations and quality of life impairments which meet the statutory definition of serious injury.
Great Expenditure of Limited Judicial Resources
Trial courts are then presented with the “serious injury” issue on a motion made by a defendant for summary judgment; and the court must then use its “powers” to discern whether the minimum legal requirements have been met to send the case to a trial by jury. The motions and papers submitted by both sides are usually copious, and thus, a thorough review of the record and current appellate decisions requires a great expenditure of limited judicial time. In any event, the decision rendered is usually challenged and refuted by the losing side; and thus many (too many) of these cases are appealed, and many of those appeals result in nonunanimous (and sometimes acrimonious) decisions which are often difficult to reconcile with prior precedent.
Elusive Standards
The enabling legislation for the No-Fault Law itself provides little or no guidance to the bench and bar as to the scope of the terms used. For example, one should reasonably assume that the legislature sought to distinguish “significant limitation of *189 use of a body function or system” from a “consequential limitation of use of a body organ or member.” (Insurance Law § 5102 [d] [emphasis added].) However, there appears to be no practical difference. Some courts have held that “consequential” means “significant” (see e.g. Altman v Gassman, 202 AD2d 265 [1st Dept 1994]); and there are abundant cases in which all of the above terms (including body function, system, organ or member) are used interchangeably. The guidelines, conditions and examples provided by the Court of Appeals in a series of decisions, including Toure v Avis Rent A Car Sys. (98 NY2d 345 [2002] [cited and discussed infra]), although very helpful, have not entirely unburdened the trial courts; and these serious injury claims continue to be the cause of incessant motion practice, and an abundant use of judicial resources at both the trial and appellate levels.
Issues Presented Herein
This case, like all other “serious injury” cases, presents the court with the ongoing and frustrating conundrum of deciding when a plaintiffs injury qualifies as significant within the meaning of the No-Fault Law.
As noted in a three to two decision rendered by the Appellate Division, First Department, concerning a similar “serious injury” claim: “This personal injury lawsuit . . . once again presents us with the sometimes frustrating task of deciding when evidence presented on a motion for summary judgment meets the serious injury threshold ..., an elusive standard that all too frequently escapes facile and final resolution” (Brown v Achy, 9 AD3d 30, 31 [1st Dept 2004] [internal quotation marks omitted; emphasis added]).
Factual Background
The accident underlying this case occurred on December 21, 2004 at approximately 12:45 p.m. at the intersection of E. 188th St. and Cambreleng Avenue in the Bronx, at which time and place the vehicles owned and driven by the plaintiff and defendant collided. The 33-year-old plaintiff, who did not lose consciousness, and was not bleeding, was removed from the scene of the accident by ambulance and taken to St. Barnabas Hospital. At the hospital, he complained of pain in his chest, neck and back, and he stated that, even though he was wearing a seatbelt, his chest hit the steering wheel. X rays were taken of the cervical spine and of the chest, both of which were determined to be negative. Thereafter, he was released the same day.
*190 On December 30th, nine days postaccident, plaintiff came under the care of Dr. Vladimir Zlatnik, an internist. The underlying treatment records, and the empirical data contained therein, were provided and reviewed by the defendants’ physicians, but were not submitted to the court. All of the information concerning the substance of plaintiffs care and treatment is gleaned from the affirmation of Dr. Zlatnik, dated April 21, 2008, which was submitted in opposition to defendants’ motion to dismiss. In any event, on plaintiffs first visit to Dr. Zlatnik, the plaintiff reported that after the accident he had ringing in his ears and nausea; and he complained of neck pain radiating down to his shoulders with numbness; periods of dizziness when turning his head; shooting pain in his arms when turning his neck, especially on the left side; and lower back pain which gets worse on physical exertion and which spreads to the right buttocks, right thigh and leg, with a tingling sensation. On that occasion Dr. Zlatnik conducted a neurological and physical examination which, with the use of a goniometer, included cervical and lumbar range of motion tests and measurements; and he found that Mr. Vidal “suffered from a limited range of motion of the cervical and lumbar spines,” and diagnosed the plaintiff with “traumatic nerve root injury, plexopathy due to plexus stretching of compression pain by injured muscles, referred nociceptive pain, myofascial pain syndrome with cervical and lumbar spine trigger points and a lumbosacral sprain.” Despite the use of the goniometer, the numerical measurements of the limitations are not set forth anywhere in the plaintiffs submissions. Dr. Zlatnik does state in his affirmation, however, that they were “less than the normal range of motion.”
Based on all of the above, plaintiff was started on a course of aggressive physical therapy (which continued from December 30, 2004 until May 27, 2005), and he was “sent for MRI and other diagnostic testing,” including nerve conduction velocity (EMG/NCV) tests. However, only the results of the MRI, which was conducted on January 17, 2005, are presented to the court on this motion.
The MRI testing of plaintiffs lumbar and cervical spine was conducted by Dr. John Rigney, a radiologist, who in an affirmation dated April 15, 2008 states that the plaintiff “suffered a posterior disc herniation at L5-S1 into the epidural fat abutting the interior sac margin and anterior disc bulges into the prevertebral soft tissues at L2-3 and L4-5; [and] . . . posterior disc bulges at C3-4, C4-5 and C5-6 all of which impinge on the thecal sac.”
*191 In the MRI report, attached to the affirmation dated January 17, 2005, the following additional relevant findings are set forth: a straightening of the lumbar curvature, and a mild loss in the signal intensity of the L2-3, L4-5, and L5-S1 intervertebral discs “which reflect mild and slight loss in fluid content respectively.”
On February 8, 2005, after a review of his own records together with the MRI results, Dr. Zlatnik concluded that plaintiffs cervical and lumbar injuries “were caused as a result of [plaintiffs] motor vehicle accident of December 21, 2004”; and “it was determined that the best course of treatment would be continued physical therapy,” which, as noted above, lasted until May 16, 2005.
In May of 2005, the physical therapy sessions were discontinued because the plaintiffs “no-fault benefits were terminated” and Dr. Zlatnik determined that, in any event, “any further physical therapy would have only been palliative in nature.” In his affirmation Dr. Zlatnik states:
“The course of treatment was designed to decrease pain, promote healing of the affected areas and restoration to pre-injury range of motion, strength and functional capabilities. However, Mr. Vidal made slow, poor and erratic improvement while under our care and continued to suffer with severe pain and exacerbations upon performance with his daily activities.” (Emphasis added.)
Dr. Zlatnik next and last examined the plaintiff almost three years later, on April 7, 2008, and reported in his affirmation, that “it is my impression that [plaintiff] continued with residual signs of right sided L5 radiculopathy and post-traumatic myofascial pain syndrome.” In paragraph 13 of the affirmation, Dr. Zlatnik also states that:
“There is objective verification of the injuries suffered by Mr. Vidal based upon my most recent examination as well as his course of physical therapy and diagnostic test results. My opinion as to the degree of permanence is based [on] these objective measurements as well as how his injuries affect his daily activities. In sum, because of the severity of the symptomatology as well as the persistence of the plaintiffs signs and symptoms, Mr. Vidal is limited in his daily activities and will continue to be because of the injuries he suffered to his back as a direct result of the accident on December 21, 2004. The plaintiff, as set forth in his complaints above, *192 has difficulty lifting and bending. Further, since the date of his accident, he has been unable to perform his usual and customary activities as he did before the accident.”
In the above-quoted statement Dr. Zlatnik appears to lump all of his examinations and findings together, and thus it is difficult to determine what, if any, objective findings were made on this last occasion to support Dr. Zlatnik’s “impressions.”
In any event, Dr. Zlatnik in his affirmation concludes and states (with reference to plaintiffs claimed ongoing limitations) that:
“The lumbar and cervical spine are areas that will continue to present problems and will cause difficulties for the rest of Mr. Vidal’s life. Based upon the severity of Mr. Vidal’s symptoms, results of examinations and past experience with similar cases, the injuries that were sustained will result in a predisposition to further complications. The trauma of the accident will cause abnormal degenerative changes at an accelerated rate. As such, he will surely sustain greater restrictions in his ranges of motion. The herniating and bulging discs produce localized pain and radicular symptoms; [and] Mr. Vidal’s prognosis is guarded. His injuries are causally related to his accident of December 21, 2004. I found him to be permanently disabled from performing heavy lifting or strenuous types of activity” (emphasis added).
At the time of the accident, the plaintiff was employed seven days a week in two different jobs. The first as a supervisor at a company called PCF, which is a publication service for the New York Times, in which capacity he supervises 360 delivery people. At this job he was required to drive around to make sure that the various routes were being covered. As an employee of PCF, plaintiff worked every night from 1:30 a.m. to 7:30-8:00 a.m., except Wednesday and Thursday. In his second job, plaintiff is employed as a messenger for a company called SDS, based in Long Island City, where he would drive to deliver medications to various dental offices. He normally worked at that job Monday through Friday from 9:30 a.m. to 5:30-6:00 p.m. As a result of the injuries sustained he was apparently unable to work for approximately one month; and has been fully employed at both jobs to date.
The Defendants’ Motion
Defendants claim that the plaintiff has not sustained a “serious injury,” as that term is defined in section 5102 of the Insur *193 anee Law; and in support thereof they submit the affirmation of Dr. Charles Totero, an orthopedist, and the report of Dr. Stephen Mendelsohn, a radiologist.
Dr. Totero saw the plaintiff on November 14, 2007 and conducted a comprehensive orthopedic evaluation, as well as a review of all of plaintiffs prior medical records,[2] and the report submitted by defendant’s radiologist, Dr. Stephen Mendelsohn. After obtaining and recording the history of the accident as well as plaintiffs work history and past medical history, the following present complaints were set forth: “The claimant tells me that his neck is improving little by little. He does have some pain which is intermittent. He complains primarily of back pain, particularly with cold weather and certain types of activities. He complains of no radiation of the pain and no paresthesis.”
The comprehensive affirmation and report includes the following range of motion findings: in the lumbar spine, extension was to 20 degrees (normal 20 degrees to 30 degrees); flexion to 75 degrees (normal 70 degrees to 90 degrees); left and right tilt 30 degrees (normal 30 degrees to 45 degrees), the straight-leg raising test was negative bilaterally although there was a complaint of left-sided low back pain on the left at 90 degrees; in the cervical spine, extension to 30 degrees (normal 30 degrees to 45 degrees); flexion to 50 degrees (normal 40 degrees to 50 degrees); and left and right rotation 75 degrees (normal 70 degrees to 90 degrees).
Apart from all of the negative observations, Dr. Totero records, with reference to the lumbar region, that “there is a mild left lumbar tenderness,” and that plaintiff “complains of left-sided low back pain on SLR on the left to 90°”; and with reference to the cervical region that plaintiff “does complain of pain posteriorly on limits of motion” and that “there is mild tenderness about the vertebral prominence (C7) and posteriorly.” It is also noted that although all ROMs are “within the normal *194 range,” some of them are at the very bottom of the ROM spectrum. In any event, Dr. Totero made a diagnosis of “cervical sprain and lumbar sprain” and concluded that since there was no “objective orthopedic findings” and “claimant is undergoing no active treatment at this time [and] is currently working in his regular capacity without restrictions, [i]t is my impression that this claimant exhibits no causally-related disability at this time [and] requires no further treatment and/or diagnostic testing.” (Emphasis added.) Dr. Totero also specifically noted that he only reviewed the MRI report and that “the films should be provided for my review and a supplemental will be done at that time.” No supplemental report has been provided.
Dr. Stephen Mendelsohn, a radiologist, reviewed the MRI films of the plaintiffs lumbar and cervical spine and concluded that the plaintiff suffered from “moderate degenerative changes at the L2-3 and L4-5 discs,” and “mild multilevel cervical degenerative changes”; and that the MRIs “reveal no evidence of focal disc herniation or any trauma related abnormality.” He did, however, specifically find, with reference to C3-4, C4-5 and C5-6, “mild circumferential degenerative bulging-, and with reference to L4-5 and L2-3 moderate desiccation and mild (or L2-3 moderate) loss of height with moderate to circumferential (L2-3) degenerative bulging”; and disagreed “with the interpretation . . . provided by Dr. John Rigney in so far as I find no evidence of disc herniation.”
The defendants argue that since the plaintiff admitted that he was unable to work for only one month, had no complaints of pain when examined, was no longer undergoing any physical therapy or medical treatment for the claimed injuries, and had not done so for the last three years, his injuries have resolved and were neither significant nor consequential.
Plaintiffs Opposition
In opposition to defendant’s motion, plaintiff submits the hospital emergency room records, his own affidavit as well as the affirmation of Dr. Zlatnik, and the affirmation of Dr. John Rigney, a radiologist, as reviewed above. As to the “gaps in treatment,” it was explained by plaintiff and Dr. Zlatnik that the failure to pursue further medical treatment after June of 2005 was caused by plaintiffs inability to afford the medical expenditures after the no-fault benefits were cut off and because treatment would have only been “palliative in nature.” Plaintiff states further that, although he continues to work two jobs (over a seven-day period each week), his injuries continue to af *195 feet his quality of life, including his “relationship” with his wife, and claims that, to date, he is also unable to lift anything heavy, grocery shop, or play soccer or volleyball.
Applicable Law
“Serious Injury”
Under the No-Fault Law, in order to maintain an action for personal injury, a plaintiff must establish that a “serious injury” has been sustained. (Licari v Elliott, 57 NY2d 230 [1982].) The term “serious injury” is defined in section 5102 of the Insurance Law as follows:
“(d) ‘Serious injury’ means a personal injury which results in death; dismemberment; disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system-, or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person’s usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.” (Emphasis added.)
The proponent of a motion for summary judgment must tender sufficient evidence to show the absence of any material issue of fact and the right to judgment as a matter of law. (Alvarez v Prospect Hosp., 68 NY2d 320 [1986]; Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985].) In the present action, the burden rests on defendant to establish, by the submission of evidentiary proof in admissible form, that plaintiff has not suffered a “serious injury.” (Lowe v Bennett, 122 AD2d 728 [1st Dept 1986], affd 69 NY2d 701 [1986].) When a defendant’s motion is sufficient to raise the issue of whether a “serious injury” has been sustained, the burden shifts, and it is then incumbent upon the plaintiff to produce sufficient prima facie evidence in admissible form to support the claim of “serious injury.” (Licari, supra; Lopez v Senatore, 65 NY2d 1017 [1985].)
A plaintiff cannot defeat a motion for summary judgment and successfully rebut a prima facie finding that he did not sustain a “serious injury,” merely by relying solely on documented subjective complaints of pain (Uddin v Cooper, 32 AD3d 270 [1st Dept 2006]), or by the mere submission of an MRI report *196 demonstrating the existence of a bulging or herniated disc, absent medical proof of a significant physical limitation related thereto. (Nelson v Amicizia, 21 AD3d 1015 [2d Dept 2005]; Guzman v Michael Mgt., 266 AD2d 508 [2d Dept 1999].)
The “Permanent Consequential” and “Significant Limitation” Categories
Claims of “serious injury” under the “permanent consequential limitation” category and under the “significant limitation” category are the most difficult for trial and appellate courts to assess. As noted above, these terms are not defined and many times are used interchangeably. In an effort to assist the trial courts, and to better implement the “legislative intent ... to weed out frivolous claims and limit recovery to significant injuries,” the Court of Appeals, in Toure v Avis Rent A Car Sys. (98 NY2d 345 [2002]), reviewed and discussed three cases in its decision, discussed infra (Toure v Avis Rent A Car Sys.; Manzano v O’Neil; Nitti v Clerrico).
In the Toure and Manzano cases, the plaintiffs claimed serious injury under the “permanent consequential” and/or “significant limitation” categories, whereas in Nitti, the plaintiff claimed injury under the 90/180-day category. Significantly, in its preamble paragraph for all three cases, the Court emphasized that in “these three cases [it] examine[d] the nature and extent of . . . objective medical proof necessary for a plaintiff to meet the ‘serious injury’ threshold under the No-Fault law.” (98 NY2d at 350 [emphasis added].) The Court cautioned that “subjective complaints alone are not sufficient”; and explained that an expert opinion, if supported by objective evidence, can be used to substantiate a claim of serious injury; and that, without an objective basis, an expert’s opinion may be deemed wholly speculative, and the claim can be found to be frivolous and/or insignificant. {Id. [emphasis added].)
The minimum required content of an expert’s opinion was also discussed by the Court of Appeals. For the “limitation” categories of serious injury, the Court stated that the expert can provide either a “quantitative” or a “qualitative” assessment of plaintiffs condition. In other words, in order to establish the seriousness of the plaintiffs physical limitations, a plaintiff may provide either “an expert’s designation of a numeric percentage of a plaintiffs loss of range of motion” (i.e., a quantitative assessment); or an expert’s evaluation which “compares the plaintiffs limitations to the normal function, purpose and use of the affected body organ, member, function or system” (i.e., a *197 qualitative assessment) (id.). In the former assessment, the expert numerically measures and compares normal ranges of motion with plaintiffs claimed loss, and provides the percentage of the loss of range of motion, whereas in the latter assessment, the expert, without numerical reference, merely compares plaintiffs limitations with normal function, purpose and use of the affected body part. In each instance, the expert must causally connect the injury to the accident and must attribute said limitations to the injuries sustained and the complaints made by plaintiff. A summary of the three cases reviewed in Toure is instructive:
In Toure, plaintiff commenced an action to recover damages for neck and back injuries which allegedly resulted in a “permanent consequential limitation of a body organ or member” and/or in a “significant limitation of the use of a body function or system.”
Defendants moved to dismiss each of plaintiffs claims and submitted sufficient medical affirmations and other prima facie proof, which indicated that plaintiff had recovered, and had not sustained a “serious injury” within the meaning of the No-Fault Law. Plaintiff in opposition submitted his own affidavit, as well as the affirmation of a neurosurgeon who had treated plaintiff for a year and a half prior to defendants’ motion, together with MRI and CT scan tests and reports.
The Supreme Court had granted defendants’ motion and dismissed the complaint, and the Appellate Division affirmed, with two Justices dissenting; the plaintiff appealed to the Court of Appeals as of right. After an examination of all the proof submitted, the Court of Appeals concluded that “[it could not] say that the alleged limitations of plaintiffs neck and back are so ‘minor, mild or slight’ as to be considered insignificant within the meaning of Insurance Law § 5102 (d),” and reversed the orders below and reinstated the complaint. (98 NY2d at 353.) It is significant to note that, in doing so, the Court of Appeals expressly noted that a quantified measurement of plaintiffs limitations was not necessary. The Court stated that “[although plaintiffs expert’s affirmation] does not ascribe a specific percentage to the loss of range of motion in plaintiffs spine, he sufficiently describes the ‘qualitative nature’ of plaintiffs limitations ‘based on the normal function, purpose and use of the body part” (id.). It was sufficient, said the Court, that the expert “attributed] the limitations in plaintiffs physical activities to the nature of the injuries sustained by opining that plaintiffs *198 ‘difficulty in sitting, standing or walking for any extended period of time and his inability to lift heavy boxes at work are a natural and expected medical consequence of his injuries’ ” (id.). The Court of Appeals, however, also again emphasized that the plaintiffs expert’s qualitative assessment was “supported by objective medical evidence, including MRI and CT scan tests and reports, paired with his observations of muscle spasms during his physical examination of plaintiff.” (Id. [emphasis added].)
In Manzano v O’Neil, the New York Court of Appeals granted leave to appeal from an order of the Appellate Division, Fourth Department, which had reversed a judgment of the Supreme Court, entered after a jury verdict in favor of plaintiff in an action in which plaintiff claimed to have sustained a “permanent consequential limitation of a body organ or member.”
At the trial plaintiff and her husband had testified that after the accident she was taken to the hospital because of pain and tingling in her neck and spine, released the same day, and when pain persisted she was treated by several health care providers and received physical therapy. However, despite said treatment, she testified that she “can no longer do heavy lifting of any kind . . . cannot shovel the driveway like I used to . . . don’t clean the house like I used to . . . can’t carry the vacuum cleaner [and] can’t pick up my children.” (Manzano at 354.)
Plaintiffs expert, an orthopedic surgeon who had treated plaintiff on four occasions, testified that upon examination he found plaintiff had tenderness in her neck and low back as well as “discomfort with extremes of motion of her neck” all of which “sprains” were consistent with a rear-end collision (id.). Upon review of MRI films which were admitted into evidence, he concluded that plaintiff had suffered two herniated, discs in her cervical spine. The Court of Appeals expressly noted that “[plaintiffs expert] opined that this injury was consistent with plaintiffs complaints regarding the physical limitations of her neck and back . . . [and] stated that plaintiffs injury was permanent, a conclusion founded on the plaintiffs ‘history, physical examination, [and] the review of the MRI scan’ ” (id.).
The Court of Appeals again rejected the notion that only an expert’s quantitative assessment can support an action of “serious injury,” and again expressly noted that the expert’s opinion and findings were sufficiently supported by a qualitative assessment and objective evidence:
“Although th[e] medical expert did not assign a *199 quantitative percentage to the loss of range of motion in plaintiffs neck or back, he described the qualitative nature of plaintiffs limitations based on the normal function, purpose and use of her body parts. In particular, [the expert] correlated plaintiff’s herniated discs with her inability to perform certain normal, daily tasks. These limitations are not so insignificant as to bar plaintiff’s recovery" (id. at 355 [emphasis added]).
In Nitti v Clerrico, the Court of Appeals reversed an order of the Appellate Division, Fourth Department, which had affirmed the judgment of the Supreme Court entered upon a jury verdict in favor of plaintiff under the 90/180-day category. That “serious injury” category[3] requires the plaintiff to establish that he suffered “a medically determined injury or impairment of a non-permanent nature which prevented [him] from performing substantially all of the material acts which constitute [his] usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment” (Insurance Law § 5102 [d]). Defendants did not contest the “substantiality” of plaintiffs limitations, and thus, the only issue presented for review was “simply whether plaintiff offered sufficient objective medical evidence to establish a qualifying injury or impairment” (Nitti at 357 [emphasis added]). In that regard the reliability of the alleged corroborating evidence (back spasm and an MRI) was challenged by defendants and reviewed by the Court of Appeals.
At trial the plaintiffs expert testified that he “detected spasm” but he inexplicably did not state what test he performed to elicit that spasm, but more importantly, conceded, upon cross-examination, that his conclusion concerning plaintiffs limitations were “subjective in nature as they relied on plaintiffs *200 complaint of pain” (id. at 357-358). His testimony and the trial record concerning the MRI were equally deficient. Neither the MRI, nor the MRI report, were introduced into evidence, and the expert merely “mentioned” the MRI report but did not even substantiate “that the underlying MRI film supported his diagnosis of an L4-5 intervertebral disk disorder” (id. at 358 [internal quotation marks omitted]). The Court of Appeals, although acknowledging that “medical testimony concerning observations of a spasm can constitute objective evidence” and that “an expert’s conclusion based on a review of MRI films and reports can provide objective evidence of a serious injury,” held, in view of the above deficiencies, that there was no reliable objective evidence supporting the plaintiff’s claim (id. at 357-358). The Court observed:
“Although medical testimony concerning observations of a spasm can constitute objective evidence in support of a serious injury, the spasm must be objectively ascertained. This requirement was not satisfied by the testimony of plaintiff s expert that he detected a spasm, where he did not, for example, indicate what test, if any, he performed to induce the spasm. Furthermore, Dr. Patriarco testified on cross-examination that the tests he administered to reach his conclusion regarding plaintiff’s limitation of motion were subjective in nature as they relied on plaintiff’s complaints of pain. Nor did the MRI report he mentioned constitute objective proof. Toure and Manzano recognize that an expert’s conclusion based on a review of MRI films and reports can provide objective evidence of a serious injury. In this case, however, the witness merely mentioned an MRI report without testifying as to the findings in the report. Moreover, the MRI report was not introduced into evidence, thus foreclosing cross-examination. Nor did Dr. Patriarco testify that the underlying MRI film supported his diagnosis of an ‘L4-5 intervertebral disk disorder.’ ” (Id. [emphasis added].)
Inconsistent Application of Toure Guidelines
A comparison of opinions issued in the Appellate Division, First Department, after Toure will exemplify the frustrations and difficulty encountered by all courts when attempting to discern whether the plaintiff has proffered sufficient evidence to establish a “serious injury.” (See and compare Brown v Achy, 9 *201 AD3d 30, 31 [1st Dept 2004], with Parreno v Jumbo Trucking, Inc., 40 AD3d 520 [1st Dept 2007].) These decisions, which were both issued in the First Department, appear to be inconsistent with each other; and the Parreno decision seems to impose conditions which are more harsh than those set forth by the Court of Appeals in the Toure series of cases. It is noted that in Parreno (which was decided by a different panel of jurists in the First Department than those in Brown), no attempt is made to distinguish or recall Brown or its rationale.
The Brown Decision
In Brown, the trial court granted defendant’s motion for summary judgment and dismissed the complaint for failure to establish a serious injury. Upon appeal to the Appellate Division, First Department, in a three to two decision (with a vigorous dissent) the order was reversed and the complaint reinstated. At the trial level, in opposition to defendant’s motion, the plaintiff submitted an MRI which demonstrated a cervical disc herniation at C3-4, as well as an EMG/NCV test (conducted six months later) which demonstrated abnormal findings at C5-6 and L5-S1 levels, and an expert’s medical affirmation which indicated that plaintiff had a 25% loss of lateral flexion and rotation cervically, and a 25% loss of forward flexion in the lumbar spine. The doctor’s findings and conclusions were based upon a recent examination which included a seated straight-leg raising test which was “positive” bilaterally at 60 degrees. It was the doctor’s further conclusion that the plaintiff had a “permanent partial disability.” The majority held that findings of a 25% loss of flexion in the cervical and lumbar spines, although “in part” based upon plaintiff’s subjective complaint of pain during range of motion tests, nevertheless raised a question of fact as to whether or not the plaintiff sustained a “serious injury” especially because these findings were supported by “other” objective evidence (9 AD3d at 33). It must be noted that the Brown decision does not mention “spasm” as a necessary ingredient for any straight-leg raising test to be considered “positive,” although the use of the words “in part” seems to infer that the other basis was spasm. The Brown court further observed that:
“Evidence of range of motion limitations is sufficient to defeat summary judgment (see Toure v Avis Rent A Car Sys., 98 NY2d 345, 350 [2002]; Eng v New Main Line Trading Corp., 249 AD2d 359 [1998]; Cassagnol v Williamsburg Plaza Taxi, 234 AD2d *202 208 [1996]). Furthermore, this Court has held that straight-leg raising tests are objective evidence of serious injury (see Aguilar v N.Y.C. Water Works, 298 AD2d 245 [2002]; Adetunji v U-Haul Co. ofWis., 250 AD2d 483 [1998]), especially where, as here, they are coupled with positive MRI and nerve conduction velocity test results.” (Brown v Achy, 9 AD3d 30, 32 [2004] [emphasis added].)
The dissent, in a somewhat critical decision, highlighted every purported weakness in the majority’s analysis and every sign, signal and circumstance, including an insufficiently explained three-year gap in treatment, from which they concluded that plaintiff had not sustained a serious injury in this accident. Of course, the quality of the objective evidence was also discussed. For comparison purposes to the Toure cases, as well as to Parreno, the rationale of the dissent is set forth herein in detail.
It was observed by the dissent that on the day of the accident (Dec. 25, 1997), this “overweight” plaintiff declined an offer to be taken to the hospital by ambulance, and chose instead to “walk away” from the scene of the accident, and take a subway to the emergency room of a rehabilitation center in Bayshore, Long Island where she resided; and where “she was examined, x-rayed, given Motrin and discharged [that same] evening” (id. at 35). Also significant to the dissent was the resumption by plaintiff of her full time employment shortly after the accident (although she claimed she was bedridden for two weeks following the accident), and that “the first professional plaintiff consulted about her alleged injuries (after her brief emergency room visit) was her lawyer . . . [and] it was her lawyer who referred her to ... a chiropractor, whom plaintiff first visited 10 days after the accident” (id. at 36). She was seen by this chiropractor periodically for a period of six months (to July 1998) and once more in September 1998; she was not seen again by the chiropractor for three years (i.e., Sept. 2001), and then only after it was necessary to respond to defendant’s motion to dismiss.
The dissent was disturbed by this three-year hiatus during which “plaintiff apparently did not receive any treatment for physical complaints allegedly connected to the subject accident”; and the dissent thought it noteworthy to mention that although she had been referred by the chiropractor to a neurologist, in June of 1998 she “made only one visit” to this neurologist who had “recommended various forms of follow-up care,” which the *203 plaintiff did not follow (id.). The dissent argued that the plaintiffs three-year gap in the treatment was not sufficiently explained (despite plaintiffs doctor’s statement that plaintiff “had reached the point of maximal medical improvement”), and concluded that
“[t]o the extent (if any) plaintiffs medical evidence might otherwise be deemed to have raised a triable issue as to the existence of a statutory serious injury . . . such evidence is negated, as a matter of law, by plaintiffs unexplained failure to obtain any treatment . . . for a period of about three years prior to the submission of her opposition to the summary judgment motion.” (9 AD3d at 38 [internal quotation marks omitted].)
The dissent also disagreed with the majority’s assertion that the explanation provided by plaintiffs doctor (maximal medical improvement) complied with Toure’s guidelines for a “sufficient explanation,” and thus concluded that this explanation given “without any substantive elaboration” was “vague and conclusory” and, thus, speculative and worthless (id.).
The dissent also was critical of the majority’s reliance upon plaintiffs neurologist’s “unsworn . . . report” and “the unsworn and unaffirmed MRI report” of plaintiff’s radiologist dated April 17, 1998, which allegedly revealed a “[c]entral disc herniation at C3-4 [and] [n]o other focal disc herniation,” noting that, in any event, this MRI report was contradicted by defendant’s neurologist, Dr. Hudak, who in an affirmed report dated September 14, 1999, “reached a different conclusion” as to the same MRI (id. at 36-37). These unsworn and unofficial reports of the plaintiffs neurologist and radiologists were held by the majority to be properly before the court because they were referred to, and used by, the defendants’ examining neurologists.
The defendant’s physician, Dr. Hudak, stated in his affirmed report that a “[r]eview of [the] actual MRI of the claimant’s cervical spine failed to reveal an acute herniated disc at any level and no herniated disc at the particular C3-4 level” (id. at 37). In addition, Dr. Hudak observed and reported, based on an examination of the plaintiff conducted in 1999, that “plaintiffs stated height was 5 feet, 3 inches, and her weight was then 290 pounds”; that all of range of motion measurements in the cervical and lumbar region, as well as in the upper and lower extremities, were normal; and that, although the report of *204 plaintiffs physician (Dr. Sultan) referred to “electrophysical evidence of acute left sided L5-S1 radiculopathy,” no such complaints were made by plaintiff at the time of the examination (id.). He concluded therefore that
“[plaintiff] is not disabled as a result of that accident [of December 25, 1997] and requires no further orthopedic care or physical therapy. There are no objective findings at this time to confirm the presence of an acute herniated disc in the area of the cervical spine related to the accident of 12/25/ 97.” (9 AD3d 30, 37 [2004].)
Dr. Rosenblum, defendants’ neurologist, based on an examination held on March 1, 2001 reported that “[a]fter conducting a variety of tests [including a seated straight-leg raising test, which was negative], there is no neurological sequela from the trauma of 12-25-97” (id. at 38 [internal quotation marks omitted]). In that regard, the dissent criticized the majority’s reliance on the alleged positive straight-leg raising tests made by plaintiffs chiropractor because “the existing record does not establish whether the particular tests used by plaintiffs medical experts were based on subjective complaints of pain” (id. at 40).
In any event, despite all of the dissent’s criticisms, the Brown majority held that plaintiff’s submissions were adequate to defeat defendants’ motion for summary judgment.
The Parreno Decision
In Parreno, a somewhat different panel of the First Department, set aside a jury finding that the plaintiff had sustained a “significant limitation of use of a body function or member.” In this case, despite the existence of objective evidence (spasm and a somewhat positive MRI) which appeared much more compelling than that in Manzano and Brown, this panel in the First Department determined and concluded that plaintiffs “medical evidence failed to establish a prima facie case of serious injury under either a quantitative or qualitative analysis.” (Parreno, 40 AD3d 520, 523 [2007].)
At the trial in Parreno, the plaintiff testified that he sustained injury to his neck and back when his vehicle was rear-ended by a heavy truck; that he was taken to the hospital for neck and back pain; and at the emergency room was X-rayed, given medication and released. Over the next five months he received physical therapy, including chiropractic care; treatment was eventually discontinued because “the facility was not being paid” (id. at 521). Because of persistent pain, plaintiff was seen *205 by an orthopedist (Dr. Kaplan) who, after examination, diagnosed a herniated cervical disc, a bulging lumbar disc, cervical and lumbar straightening, radiculopathy, and muscle spasm with trigger points, and who administered a series of steroid injections which provided only temporary relief. He was treated by Dr. Kaplan on seven occasions between January 2001 and May 2003; on the initial visit the examination revealed the following findings: a “30% [cervical] limitation in the range of motion”; “multiple trigger points of muscular spasm in his neck and shoulder girdle”-, “spasm and tightness of the lower back [with] pain in the lower back and legs during a straight leg raising test at 70 degrees, whereas the normal is 90 degrees” (id.). Dr. Kaplan testified that “the findings related to muscle spasm [were] objective . . . [and] beyond the control of the patient,” and it was his opinion that “the return of muscle spasms was an indication of an ongoing problem with the neck and lower back, causing the limited ranges of motion” (id. [internal quotation marks omitted]). It was his opinion that because plaintiff was still experiencing pain and limitations five years after the accident that plaintiffs injuries were both “significant” and “permanent” and causally related to the accident.
At the trial the plaintiff testified that his pain was ongoing making it “difficult [for him] to turn his neck or bend forward or turn side to side”; that it prevents him from taking out the garbage without assistance; that he was required to reduce his work schedule as an inspector (although he only missed three or four days from work); and that his pain has caused him to develop a temper leading to marital problems (id. at 521).
At the trial, the defendants offered the testimony of two medical witnesses (Dr. Eisenstadt, a radiologist, and Dr. Gorsky, whose medical specialty was not identified in the decision).
Dr. Eisenstadt examined MRI films of the plaintiffs cervical and lumbar regions and testified with reference to the lumbar MRI, that she “found no evidence of traumatic change, no straightening of the lumbar spine and no bulging disc”; with reference to the cervical MRI she testified that the film was “blurry” but she found “no signs of trauma or disc herniation” but she did concede that this MRI showed “some straightening” and that “such straightening could be caused by a muscle spasm” but in this case she believed “it was the result of patient movement” (id. at 522).
Dr. Gorsky, the defendant’s second medical witness, who conducted a five-minute examination, found “some limitation in *206 his head and neck, but found normal results for the straight leg raising test, which [in his opinion] indicated no herniated disc” (id. [internal quotation marks omitted]). He concluded that “plaintiff had intermittent complaints of neck and back pain that were consistent with his age and occupation, and that there were no objective findings to suggest that the accident caused any impairment, permanency or disability” (id.).
On this record the jury returned a split verdict finding that plaintiff failed to establish “a permanent consequential limitation of the use of a body organ or member” but that plaintiff did sustain a “significant loss of use of a body function or member,” and made an award for past and future pain and suffering.
The Parreno court, despite the presence of ROM limitations and objective evidence (spasm and some MRI findings indicative of spasm) supporting plaintiff’s doctors’ qualitative and quantitative analysis, ruled that, as a matter of law, plaintiff failed to establish a serious injury. The Court held that, although plaintiffs doctor found a quantitative 30% loss of cervical motion and a 20 degrees difference from normal in the lumbar region during straight-leg raising tests, “any fair reading of the record demonstrates that these numerical restrictions on range of motion were premised exclusively on plaintiff’s subjective indications of pain.” (Id. at 523-524 [emphasis added].) This finding, however, appears to be contradicted by the trial record and, in any event, appears inconsistent with the Toure guidelines, as well as with this Department’s prior holding in Brown. Muscle spasms detected during range of motion tests are universally recognized (medically and legally) as an objective sign supporting a claim of serious injury. Dr. Kaplan (plaintiff’s orthopedist) so testified. Moreover, in compliance with the Toure guidelines, Dr. Kaplan provided both a “quantitative” and a “qualitative assessment” which related these findings to plaintiffs ongoing limitations and pain. Despite this evidence in the record, and the Court’s obligation to view the trial evidence in a light most favorable to the plaintiff, the Parreno bench inexplicably concluded:
“Although plaintiffs expert did identify some objective evidence of plaintiffs injury — a herniated disc, a bulging disc and multiple points of muscular spasm — this evidence alone was insufficient to establish a serious injury, in the absence of objective medical evidence showing the extent or degree of *207 the limitations resulting from these specific injuries and their duration.” (Id. at 524.)
The Parreno panel also stated, with reference to the qualitative assessment, that plaintiffs doctor’s testimony was “[m]anifestly . . . vague” and “fail[ed] to compare plaintiffs limitations to the normal function, purpose and use of the cervical and the lumbar regions of his spine” (id.). However, the trial record (as revealed in the opinion) discloses that, in addition to the plaintiffs testimony regarding life quality changes, Dr. Kaplan corroborated same stating, among other things, that “[h]e certainly has pain with activities, acquires pain, complained of pain with activities, complained of pain with weather changes. He has muscular spasm that limits his motion, worse at times than other times. And, so, he has a limited function, certainly” (id.).
The Dilemma Continues
The Parreno standard of review seems harsh and much more stringent than that found satisfactory in Toure and Brown (supra). The Parreno bench appears to require a more technical and ritualistic application of the “qualitative” and “quantitative” assessments discussed and approved in Toure. The Parreno review does not appear to have “viewed the trial evidence in a light most favorable to the plaintiff,” and unlike the Brown panel, appears to apply a construction which would, when technical requirements are not meticulously followed, deprive a plaintiff of a common-law right. Its construction, at least to this court, appears to go far beyond what is necessary to weed out the “frivolous” and the “minor, mild and slight limitations” which are deemed insignificant by the No-Fault Law.
“Gaps In Treatment”
An unexplained gap in, or termination of, treatment, can result in a judicial determination that plaintiffs injuries have resolved and were thus not significant within the meaning of the No-Fault Law. (See Pommells v Perez, 4 NY3d 566 [2005].) In evaluating whether the plaintiff has sustained a serious injury under the categories of “permanent consequential limitation” or “significant limitation,” it is appropriate for the court to look at any gaps in the plaintiffs treatment, even if there is objective medical proof of injury. As stated by the Court of Appeals in Pommells: “We conclude that, even where there is objective medical proof, when additional contributory factors interrupt the chain of causation between the accident and claimed injury — such as a gap in treatment, an intervening medical *208 problem or a preexisting condition — summary dismissal of the complaint may be appropriate.” (Id. at 572 [emphasis added].)
While a gap in, or cessation of, treatment is not necessarily dispositive — since the law does not require a record of needless treatment in order for a plaintiffs case to survive a summary judgment motion — a plaintiff who suspends therapeutic measures, while claiming a serious injury, must offer a bona fide and reasonable explanation for having done so. For example, when the plaintiff has provided evidence in admissible form from his physician that a continuation of medical therapy would have only been “palliative in nature,” a subsequent gap in treatment would not necessitate the granting of summary judgment to the defendant, since the cessation of treatment was adequately explained. (Pommells v Perez, supra; Brown v Dunlap, 4 NY3d 566 [2005].)
Another explanation deemed reasonable is a cessation or gap caused by a claimant’s inability to afford continued treatment after no-fault benefits have been discontinued. (See Wadford v Gruz, 35 AD3d 258 [2d Dept 2006]; Francovig v Senekis Cab Corp., 41 AD3d 643 [2d Dept 2007].) However, inconsistent explanations for a cessation of treatment can be fatal to a claim of serious injury. (See Gonzalez v A.V. Managing, Inc., 37 AD3d 175 [1st Dept 2007] [summary judgment granted where inconsistent explanations given by plaintiff as to reasons for cessation of treatment; his own doctor stated that treatment should not have been stopped, yet records showed plaintiffs range of motion findings were normal within four months of happening of accident]; see also DeLeon v Ross, 44 AD3d 545 [1st Dept 2007] [undisputed 20-month gap not adequately explained by plaintiffs undocumented assertion that he discontinued treatment only after his no-fault benefits were cut off due to his inadvertent failure to attend a required physical examination for the carrier]; Brown v City of New York, 29 AD3d 447 [1st Dept 2006] [explanation held not reasonable where plaintiffs expert was retained long after cessation of treatment, and plaintiff failed to provide contemporaneous medical records supporting the explanation that plaintiff had achieved maximum recovery].)
What constitutes a significant gap in treatment is still a work in progress; the amount of time which constitutes a fatal “gap” has not been definitively determined. (See Sung v Mihalios, 44 AD3d 500 [1st Dept 2007] [unexplained gap of “one year” does not lead to grant of summary judgment]; Ning Wang v Harget Cab Corp., 47 AD 3d 777 [2d Dept 2008] [a 10-month gap *209 was held to require an explanation]; Phillips v Zilinsky, 39 AD3d 728 [2d Dept 2007] [inadequate explanation for 15-month gap in treatment warrants grant of summary judgment].)
Recent Evidence of Serious Injury
A plaintiff should not rely merely on stale medical reports and current “self serving” sworn statements that his/her limitations are ongoing. Recent cases are now looking to the duration of the limitations and thus require current proof (i.e., recent to the motion) that plaintiff is still impaired by said limitations. (See Shvartsman v Vildman, 47 AD3d 700 [2d Dept 2008].) Proof of significant limitations which are merely relatively contemporaneous with the accident may not be sufficient to establish a serious injury especially if there is evidence provided by defendant’s experts that plaintiffs injuries have resolved and plaintiff has recovered. In Shvartsman (at 701), it was held:
“The mere existence of a herniated or bulging disc, and even a tear in a tendon, is not evidence of a serious injury in the absence of objective evidence of the extent of the alleged physical limitations resulting from the injury and its duration (see Patterson v NY Alarm Response Corp., 45 AD3d 656 [2007]; To-bias v Chupenko, 41 AD3d 583, 584 [2007]; Mejia v DeRose, 35 AD3d 407, 407-408 [2006].” (Emphasis added.)
Discussion and Conclusion
Competing Statutes and Rules of Construction — “A Judicial Dilemma”
The No-Fault Law has a remedial purpose, i.e., to reduce insurance premiums by weeding out frivolous claims and limiting recovery to significant injuries (see Dufel v Green, 84 NY2d 795, 798 [1995]; Montgomery v Daniels, 38 NY2d 41 [1975]). This law is in derogation of a common-law right of an injured person to bring an action for injuries sustained in an automobile accident caused by the wrongful conduct of another motorist. Being remedial in nature, the No-Fault Law must be accorded a liberal interpretation and the widest application in order to carry out reforms intended. (McKinney’s Cons Laws of NY, Book 1, Statutes §§ 302, 321.) However, that law, being in derogation of common-law rights, also involves the “rule of strict construction,” which requires, therefore, an interpretation of the No-Fault Law which “makes no further innovation upon common law rights than the particular case requires.” (Statutes § 301 *210 [a], Comment; §§ 304, 311.) Courts are thus confronted with a conundrum caused not only by the above conflicting statutory requirements, but also by what often seems like an impossible task: to discern, on motion, the false and frivolous and to distinguish “minor, mild or slight” injuries from appropriate claims. These impairments, though unobservable, can cause genuine quality of life changes in those who really suffer same. These are usually issues which are presented to jurors at trial, who have the benefit of live testimony and can make credibility determinations. The task of deciding these issues on “papers” is, at best, extremely difficult.
A Difficult and Frustrating Task
There are those who harbor a flawed assumption that judges (on papers), rather than medical scientists and jurors, are more able and equipped to discern and distinguish the false, frivolous and/or insignificant claims of serious injury from those which can cause legitimate, sometimes profound and “more than frivolous” limitations, pain and quality of life impairments. This legislatively imposed task has caused more than a season of judicial discontent and frustration, it has resulted in an extremely difficult and flawed process which results too often in an inconsistent and unfair application of the law.
This court is not sufficiently prescient to determine whether this plaintiff actually, as claimed, has ongoing significant cervical and lumbar pain, limitations and quality of life impairments. Certainly these kinds of injuries and limitations can be feigned and/or exaggerated. When genuinely significant, however, cervical and lumbar injuries can be insidious and their syndrome is characterized by periods of remission and exacerbation which is not readily observable by others. Certainly if plaintiffs injuries have continued to affect his relationship with his wife and preclude him from lifting anything heavy, playing soccer or volleyball, and assisting his wife with ordinary chores, such as grocery shopping, then, this court would certainly not conclude that the claim is frivolous or that the injuries are insignificant. But since the court cannot infallibly predict what the plaintiffs future course may be, it must make its decision on this motion based upon the examples and standards (clues) promulgated by appellate authority to assist it in making its determination. This obligation, as discussed above, can be exceedingly difficult and frustrating.
The Defendants’ Proof
The defendants have provided sufficient proof in admissible form to establish prima facie entitlement to the relief requested. *211 Dr. Totero swore that he found, no objective evidence of range of motion restrictions in either the plaintiffs cervical or lumbar regions, found no objective indication of any disability, and concluded that it was his opinion that the plaintiff had sustained strains and sprains which were not disabling and required no further treatment. However, it is noted that he did elicit tenderness and complaints of pain not inconsistent with plaintiffs allegations of serious injury.
Dr. Mendelsohn, a radiologist, reviewed the MRI films taken of the plaintiffs cervical and lumbar areas, and concluded that both areas demonstrated only degenerative changes, and no herniations caused by the accident, but did concede that plaintiff had bulges at multiple levels.
The conclusions reached by the defendants’ medical team are corroborated by plaintiffs admission that, except for one month following the accident, he is capable of, and continues to, work at two full time jobs.
The Plaintiffs Proof
In the case at bar plaintiffs physician, Dr. Zlatnik, based upon his full treatment, current examination, course of physical therapy and diagnostic test results, found and concluded in essence that the plaintiff was permanently disabled from performing heavy lifting or any other types of strenuous activity, that his lumbar and cervical spines will continue to cause him problems for the rest of his life, that his herniated and bulging discs will produce localized pain and radicular symptoms, and that he will be predisposed to further complications.
Unfortunately, none of Dr. Zlatnik’s reports of, or notes taken during the examinations have been provided on this motion, and the court is thus unable to independently ascertain what objective evidence {apart from the MRI), if any, existed at that time to establish that plaintiff had suffered and is still suffering from the cervical and lumbar injuries and limitations described. Dr. Zlatnik does state that he detected cervical and lumbar spine “trigger points” (a form of spasm or tenderness within a muscle); however it is unclear whether these findings were objectively determined, or based upon subjective complaints of pain. In any event, a review of plaintiffs MRI and the course of treatment and medical assessment provided by Dr. Zlatnik is useful. Apart from the six months of aggressive therapy conducted under Dr. Zlatnik’s supervision, the record before the court indicates that plaintiff was examined by Dr. Zlatnik on three occasions, i.e., initially on December 30, 2004, on a second *212 occasion on February 8, 2005 (after a review of the MRI, dated Jan. 17, 2005), and finally, almost three years later, on April 7, 2008. This last examination, which was not for treatment, was conducted in order to provide an affirmation in opposition to defendants’ motion.
During his initial examination of plaintiff, after receiving a history of complaints consistent with injury to the cervical and lumbar regions, Dr. Zlatnik conducted a physical and neurological examination, which included “measured” range of motion tests, using a goniometer. Although Dr. Zlatnik concluded that the ROMs were “less than normal,” this court, on the record presented, is unable, on a “quantified” review to determine whether they were significant or “minor, mild or slight,” since no numeric percentages have been provided; and, although Dr. Zlatnik states that he found the cervical and the lumbar spine trigger points during this examination, it is unclear from the record if these trigger points findings were based wholly or partially on subjective complaints. Thus, the court must rely on plaintiff’s statements and complaints together with Dr. Zlatnik’s “qualitative” assessment, and of course, the MRI, conducted on January 17, 2005.
It is noted that, although the plaintiff was sent by Dr. Zlatnik “for an MRI and other diagnostic testing,” only the MRI results are presented for review on this motion and the court therefore must assume that the other testing was negative.[4] However, the MRI reports do contain objective proof of disc injury, i.e., a disc herniation at L5-S1 multiple cervical and lumbar bulges with impingement, a straightening of the lumbar curvature (which is consistent with a muscle spasm) and early degenerative changes, as demonstrated by a “mild loss of signal intensity” at multiple lumbar disc sites, “which reflect mild and a slight loss in the fluid content.” These early degenerative changes are not inconsistent with recent trauma, and Dr. Zlatnik did opine that “the trauma of this accident will cause abnormal degenerative changes at an accelerated rate [and] as such [plaintiff] will surely sustain greater restrictions in his ranges of motion,” and that “the injuries that were sustained [by plaintiff] will result in a predisposition to further complications.”
On February 8, 2002, after a review of the above MRI reports the plaintiff was again examined and continued on an aggres *213 sive course of physical therapy, which continued until May 16, 2005, at which time it was discontinued because no-fault benefits were terminated and because plaintiff “made a slow, poor and erratic improvement” and because it was determined that “further medical therapy would be only palliative in nature.” Thus, in accord with the rationale of Pommells and Brown (supra), the plaintiffs cessation in treatment has been sufficiently explained.
On the last examination, April 7, 2008, “it was [Dr. Zlatnik’s] impression that Victor Vidal continued with residual signs of right sided L5 radiculopathy and post-traumatic myofascial pain syndrome.” However, again no report and details have been provided, but Dr. Zlatnik asserts in his affirmation that he obtained “objective verification of the injury suffered by [plaintiff] upon [the] most recent examination as well as his course of physical therapy and diagnostic test results.”
Depending upon which of the above reviewed appellate precedents this court chooses to accept as controlling, the plaintiff here will either succeed or fail. Certainly the proof will be deemed insufficient if measured with the Parreno yardstick— where, despite the production of objective evidence (spasm and a positive MRI), and both a quantitative and qualitative assessment, plaintiffs proof was found by the Court to be lacking.
Certainly the submissions on behalf of the plaintiff are not overwhelming in their specificity; however, they do, nevertheless, reach the level where this court finds a question of fact has been raised as to whether the plaintiff sustained a serious injury as a result of the accident. In reaching this conclusion, the court rejects the Parreno decision and specifically relies on the rationales of, and holdings in, Manzano v O’Neil (supra) and Brown v Achy (supra). The ruling in Parreno seems questionable and out of step with the more liberal guidelines provided by the Court of Appeals in Manzano. Although Parreno is a First Department case and a precedent which ordinarily would be absolutely binding on this court (Mountain View Coach Lines v Storms, 102 AD2d 663 [2d Dept 1984]), it conflicts with Brown, an equally binding First Department precedent, as well as with Manzano, an even more binding one. In view of these conflicting decisions, this court is free to fashion a decision which it deems to be appropriate and consistent, not only with Manzano and Brown, but also with the overall objective sought to be achieved by the No-Fault Law, and with the rule of statutory construction which “make[s] no further innovation upon com *214 mon law rights than the particular case requires.” (Statutes § 301 [a], Comment; see Reyes v Sanchez-Pena, 191 Misc 2d 600, 606 [Sup Ct, Bronx County 2002].)
In Manzano the Court of Appeals reversed a dismissal of the plaintiffs complaint by the Appellate Division since it found that a sufficient qualitative assessment (supported by MRI findings) had been presented by the plaintiff. Her expert had testified that the plaintiffs complaints were consistent with the injury, that the injury itself was permanent, and that this conclusion was founded on the plaintiffs history, physical examination and review of an objective test (an MRI).
In Brown, the First Department reinstated a complaint which had been dismissed at the trial level, because it found that the plaintiffs evidence on range of motion limitations (including straight-leg raising tests) was sufficient to defeat summary judgment since those findings, although partially based upon subjective complaints, were also supported by other objective evidence such as an MRI and nerve conduction velocity test.
Similarly, here, although the affirmation of plaintiffs doctor does not provide numerical percentages or degrees of range of motion loss, he does, however, find deficits in the ranges of motion as compared to normal, and his conclusions are supported by the existence of trigger points (a form of spasm) and another objective test (an MRI) that contains numerous positive findings consistent with, and supportive of, plaintiffs ongoing complaints. On this record, giving the plaintiff every fair inference, this court cannot conclude, as a matter of law, that plaintiffs injuries and limitations are “mild, minor or slight.”

. Although these examinations are customarily referred to as “independent medical examinations,” this court recognizes that such is not truly the case. As aptly stated in Bazakos v Lewis (56 AD3d 15, 18 [2d Dept 2008]),
“the time has come to acknowledge the essential nature of the relationship inherent in the performance of a statutory medical examination, pursuant to 22 NYCRR 202.17, by a physician retained and paid by a defendant’s insurance carrier to assist in the defense of a personal injury action and the duty that flows to a party outside that relationship — in this case a personal injury plaintiff. It is beyond cavil that a statutory medical examination is an adversarial process. The examinee’s attendance is compelled by rule of law (see 22 NYCRR 202.17), and his or her engagement and interaction with the examining physician is nonconsensual. ’ ’

. Dr. Totero affirmed that he reviewed the following records: the plaintiffs bill of particulars; neurological evaluation of Dr. Zlatnik of December 30, 2004; the MRI of the cervical and lumbar spines of January 17, 2005; the ambulance call report of December 21, 2004; emergency room record from St. Barnabas Hospital, including reports of X rays of the cervical spine and chest X ray, as well as report of an EKG, taken on December 21, 2004; medical records from Rego Park Rehabilitation; handwritten physical therapy progress notes; electrodiagnostic studies of both the upper and lower extremities, performed by Dr. Zlatnik on January 31, 2005; MRI of the thoracic spine from January 17, 2005; and the interpretation of the cervical and lumbar MRIs, by Dr. Stephen Mendelsohn.

. When a claim is raised under this category of serious injury, it has been held that the plaintiff must provide proof that his or her activities were curtailed to a “great extent,” rather than to a “slight” one (Berk v Lopez, 278 AD2d 156, 157 [1st Dept 2000]; Szabo v XYZ, Two Way Radio Taxi Assn., 267 AD2d 134 [1st Dept 1999]; Badger v Schinnerer, 301 AD 2d 853 [3d Dept 2003]; Dabiere v Yager, 297 AD2d 831 [3d Dept 2002]) and the proof as to the claimant’s alleged medically determined injury or impairment must be supported by objective evidence. (Nitti v Clerrico, supra; Uddin v Cooper, 32 AD3d 270 [1st Dept 2006]; Alexander v Garcia, 40 AD3d 274 [1st Dept 2007].) Of course, neither the statute nor the decisions define and clearly distinguish a “great” impairment from a “slight” one, and thus we have another amorphous standard.

. Since the plaintiff has chosen not to provide the court with the report of electrodiagnostic studies conducted by Dr. Zlatnik on January 31, 2005, the court has not considered the statement in defendants’ doctor’s report that the test was allegedly “consistent with L5-S1 radiculopathy.”